Filed 8/8/25  P. v. Williams CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>SAMUEL DAVID WILLIAMS,<br><br>     Defendant and Appellant. | A170855<br><br>(Humboldt County<br>Super. Ct. No. CR2301122) |

Defendant Samuel Williams, formerly a lieutenant in the Humboldt County Sheriff's Office, was convicted of criminal threats and brandishing a firearm after confronting his estranged wife and the man he found in bed with her.  A jury found Williams guilty of both counts, and he was placed on two years of formal probation.

On appeal, Williams claims that the trial court improperly (1) refused to instruct the jury on self-defense in connection with the criminal-threats charge and (2) limited expert testimony regarding police training and use-of-force techniques.  He also claims that the cumulative effect of these errors warrants reversal.  We reject his claims and affirm.

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

### A.     *Background*

Williams and his wife (wife) lived together in their Humboldt County house until marital difficulties prompted Williams to move into a separate apartment. Wife believed that the marriage was effectively over because they were separated, and she believed that Williams would not come to her home without first notifying her.

The victim, B.K., and wife were co-workers and friends. They frequently texted and occasionally went out together after work. Before moving out of the marital home, Williams told wife he suspected she and B.K. were more than friends, which she denied.

Williams sent B.K. the following email in late 2022: "Hey, [B.] My name is Samuel—Sam Williams. I believe you know my wife . . . . I see that you guys communicate quite personally a lot, so I just figured I would introduce myself. Hope you have a good night." B.K. and wife did not change their behavior in response to the email.

B.K. testified that on December 31, 2022, Williams called him from wife's phone and said, "Hey, [B.] This is Sam. If you ever contact [wife] on this number again, I will fucking kill you. I will beat you to the point of no recognition." B.K. felt "shook up" after the phone call. As a result of the call, he and wife chose to stop speaking to each other for about a month.

B.K. recounted the incident to a friend who was a former sheriff's deputy. The former deputy suggested that B.K. talk to someone in the Humboldt County Sheriff's Office who had a higher rank than Williams did. B.K. then contacted the undersheriff and communicated his desire that Williams not contact him again.

Several days later, Williams called B.K. from his personal number. During the call, he acknowledged that B.K. deserved an apology and described himself as "a very jealous husband." He did not contact B.K. again until the March 2023 incident at issue.

The parties agree that B.K. held a valid concealed-carry permit and brought a gun with him to wife's home on the day of the March incident. But they disagreed as to whether wife knew that B.K. had a permit and regularly carried a firearm, and whether she relayed that information to Williams before the incident. Williams testified that in November 2022, wife told him B.K. "may have a permit." While B.K. testified that wife knew he carried a gun on their dates, wife testified that she first learned B.K. had a gun when he brought it to her house on the day of the incident.

### B.    *The Confrontation*

Early on the morning of March 24, 2023—four days after Williams moved out of the marital house and into his own apartment—he walked over to the house alone to retrieve furniture pads. When he noticed B.K.'s car parked outside, he returned to his apartment, where his and wife's 21-year-old daughter (daughter) had spent the night. Williams testified that he went back to his apartment intending to return to the house with daughter, explaining that they were "just gonna ask [B.K.] to leave" and he wanted a witness to anything that happened. Neither Williams nor daughter notified wife of their imminent arrival at the house.

Once Williams and daughter arrived at the house, daughter began recording video on her cell phone. At trial, daughter explained, "My mom misremembers things sometimes and says things happened when they didn't, and having that video was solid proof." The video captures portions of the events that followed.

3

Williams entered the house armed with the gun he usually carried, not yet drawn but in one of his pockets. After Williams and daughter entered the house, he walked straight into the primary bedroom. Wife and B.K. were there, engaged in consensual sex. On the video, Williams can be clearly heard saying, "You better get the fuck out of my house before I fucking kill you, you son of a bitch," as he enters the bedroom.

The video does not show when Williams drew his gun, although he and the other witnesses agreed that he did so at some point while in the bedroom. B.K. testified that Williams was already pointing the gun at him when Williams made the statement quoted above. Daughter, on the other hand, recalled that Williams produced the gun only after the confrontation began, though unquestionably while he was still in the bedroom. Williams testified that he did not remember exactly when he pulled the gun or how high he was holding it while in the bedroom. He admitted that while in the bedroom, he did not see any weapons or ask whether B.K. possessed one. Williams testified that he nonetheless "believed that there was a firearm [other than his own] in play."

The video does not clearly show what occurred next, but the parties' testimony was largely consistent with the following facts. B.K., who was naked, scrambled on the floor on one side of the bed, attempting to grab his pants. At that point, the video shows Williams moving quickly to that side of the bed, where he stood over B.K., pointing the gun in his face and yelling obscenities. Williams testified that he feared for his safety as B.K. grabbed his clothes off the floor. B.K. testified that he believed he was about to die.

Still exhibiting his gun, Williams followed B.K. from the bedroom down the hallway toward the kitchen, repeatedly calling B.K. a "motherfucker." The video shows B.K. retreating down the hallway, holding his pants to cover

4

his body, and extending an open palm in a placating gesture. B.K. had left his gun, keys, and phone on the kitchen counter, and as the men moved into the kitchen, he said, "Can I get my keys? My keys are on the table." Williams replied, "[Y]ou're about to die[,] you dirty motherfucker."

The video does not clearly show the next events, but the parties agree that once in the kitchen, B.K. attempted to retrieve his firearm by covering it with his sweatshirt and dragging it toward himself. B.K. testified that before he could reach his gun, Williams slammed his own hand onto it and grabbed it. Williams, however, testified that B.K. already had the gun in his hand and had lifted it off the table when Williams slammed the firearm back onto the table. Whether or not B.K. actually touched the gun, he was unable to secure it before Williams seized it.

Once Williams secured both his own firearm and B.K.'s, the video depicts him leveling his weapon at B.K.'s chest. B.K. managed to retrieve his car keys from the kitchen, but with Williams aiming a gun at his chest, he left behind his phone, his wallet, and his own gun. Still unclothed, B.K. fled the residence. The video clearly shows Williams maintaining the chest-level aim while following B.K. out toward the door. Williams then stood on the porch and watched as B.K. left in his vehicle. During this time, Williams continued to hold B.K.'s gun, and B.K. made no effort to reclaim it. B.K. drove to a friend's house, dressed, and reported the incident to the Sheriff's Office.

After B.K. left the house, Williams also called the Sheriff's Office, and a deputy came to the house. Williams asked the deputy to secure B.K.'s gun, which was still there, but the deputy declined to do so because the gun was lawfully owned and he had no legal authority to confiscate it.

Williams initially reported to the deputy that he had "not so kindly" asked B.K. to leave. When wife, who was still present, interjected, "At gunpoint," Williams confirmed, "I not so kindly at gunpoint asked him to leave." Williams later acknowledged that the language he used with B.K. was "very unprofessional" and inconsistent with the Sheriff's Office's standards.

### C. Expert Testimony on Police Techniques

Chris Coleman, a forensic scientist with crime-scene reconstruction experience but no patrol or SWAT background, testified for the defense on police use-of-force and de-escalation techniques. He testified that police defensive-tactics training is designed to gain compliance and includes various techniques such as de-escalation, firearm retention, and lethal force. Particularly relevant was training in "command presence" which, Coleman explained, ranges from the officer's uniform to verbal commands, and, if needed, non-lethal force. When the person who is the target of de-escalation has access to a weapon, the danger increases, so officers are trained to elevate their posture to deter violence, including drawing and displaying their firearm if needed.

Based upon his review of daughter's video, Coleman described Williams's statements as authoritative verbal commands or "verbal judo," a tactic that uses a raised voice to secure compliance. Coleman opined that Williams's objective was to remove B.K. from the residence, and Williams's response was ultimately "appropriate" because "he didn't have to shoot anybody."

Coleman acknowledged that standard police training instructs officers to de-escalate confrontations. When confronting an armed suspect, an officer should issue a concise directive—such as "Put down the gun before I shoot

6

you"—and avoid using profanity, making death threats, or brandishing a weapon. Even crediting Williams's belief that B.K. might be armed, Coleman conceded that B.K. did not "act[] in any threatening way," displayed no combative body language, and appeared compliant with Williams's commands. Williams likewise testified that B.K. made no threatening movements during the encounter. Coleman and Williams agreed that less threatening tactics than the ones Williams used would have been appropriate even if B.K. had been armed.

### D.    *Procedural History*

Williams was charged with one felony count of criminal threats and one misdemeanor count of brandishing a firearm.[1] During the conference on jury instructions, Williams's trial counsel requested self-defense instructions on both counts. The court denied the request as to the criminal-threats charge but granted it as to the brandishing charge.

Regarding the criminal-threats charge, counsel asked for an instruction on self-defense because "there isn't any case law saying that it does not apply" to that crime. Counsel cited two unpublished opinions that found self-defense inapplicable on the facts but that declined to rule out the possibility that the doctrine might apply to the offense of criminal threats in other circumstances. The prosecutor opposed the request, arguing that reliance on unpublished authority was inappropriate and noting that even the cases cited did not affirmatively support giving the instruction. In denying the request, the trial court reasoned that the cited cases were non-precedential.

---

[1] Williams was charged under Penal Code sections 422 (criminal threats) and 417, subdivision (a)(2)(B) (brandishing). All further statutory references are to the Penal Code unless otherwise noted.

7

Regarding the brandishing charge, the trial court granted the request to instruct the jury on self-defense, explaining that the absence of lawful self-defense is itself an element of brandishing and that "the People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense." The court subsequently instructed the jury under CALCRIM No. 983 that to prove Williams was guilty of brandishing a firearm, the prosecution had to prove that "1. The defendant drew or exhibited a firearm in the presence of someone else; [¶] 2. The defendant did so in a rude, angry, or threatening manner; [¶] AND [¶] 3. The defendant did not act in self-defense."

The trial court instructed the jury under CALCRIM No. 3470 on the elements of self-defense: "1. The defendant reasonably believed that he was in imminent danger of suffering bodily injury; [¶] 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger." The court further instructed the jury under CALCRIM No. 3472 that self-defense cannot be contrived, so there is no right to self-defense if the defendant provokes the fight or quarrel.

In addition, the trial court instructed the jury under CALCRIM No. 1300 on the elements of criminal threats as follows: "1. The defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to [B.K.]; [¶] 2. The defendant made the threat orally; [¶] 3. The defendant intended that his statement be understood as a threat; [¶] 4. Under the circumstances, the threat was so clear, immediate, unconditional, and specific that it communicated to [B.K.] a serious intention and the immediate prospect that the threat would be carried out; [¶] 5. The threat actually

8

caused [B.K.] to be in sustained fear for his own safety; [¶] AND [¶] 6. [B.K.'s] fear was reasonable under the circumstances."

The trial court limited the expert testimony on police tactics to the brandishing charge. Specifically, before Coleman testified, the court told the jury, "You're to consider this testimony only in connection with the second charge against Mr. Williams, which is the charge of brandishing a firearm. You're not to consider this testimony in any way in connection with the first charge, that of making criminal threats."

The jury convicted Williams of both counts. In May 2024, the trial court placed him on two years formal probation. Originally, probation was granted on the condition that he serve 90 days in jail, but the court later modified that condition to require 150 hours of community service instead.

## II.
### DISCUSSION

### A. *The Trial Court Did Not Err by Refusing to Instruct on Self-defense as a Defense to Criminal Threats.*

Williams contends that the trial court prejudicially erred by declining to instruct on self-defense regarding the criminal-threats charge. We are not persuaded. Even assuming, without deciding or implying, that self-defense can be a defense to a criminal-threats charge, there was insufficient evidence to justify giving the instruction in this case.

#### 1. Governing legal principles

The offense of misdemeanor brandishing a firearm is committed when a person, "except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether unloaded or loaded, in a rude, angry, or threatening manner." (§ 417, subd. (a)(2).) The offense of criminal threats is committed when a person "willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific

9

intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for [the person's] safety or for [the person's] immediate family's safety." (§ 422, subd. (a).)

To justify an act of self-defense in the non-homicide context, a defendant must " 'have an honest *and reasonable* belief that bodily injury is about to be inflicted.' " (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064.) The belief in the need for self-defense must be objectively reasonable as evaluated from the standpoint of a reasonable person in the defendant's position. (*People v. Horn* (2021) 63 Cal.App.5th 672, 683.) " '[A]ny right to self-defense is limited to the use of such force as is reasonable under the circumstances," that is, the force sufficient to prevent the injury. (*Minifie*, at pp. 1064–1065.) Thus, the right ends when the real or apparent danger ceases. (*People v. Pinholster* (1992) 1 Cal.4th 865, 966, disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459.) Finally, the right to self-defense " 'may not be invoked by a defendant who, through [the defendant's] own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which [the] adversary's attack or pursuit is legally justified.' " (*People v. Eulian* (2016) 247 Cal.App.4th 1324, 1333.)

> 2. No substantial evidence supported a self-defense instruction for criminal threats.

We reject Williams's claim that the trial court prejudicially erred by declining to instruct the jury that self-defense applies to criminal threats. As Williams acknowledges, no published authority recognizes self-defense as an

10

affirmative defense to a charge of criminal threats.  But even assuming that the doctrine could apply, the record lacks substantial evidence that Williams held an objectively reasonable belief of imminent bodily harm when he threatened B.K.  Accordingly, the court properly declined to give the instruction.

Williams was charged with only one count of criminal threats, but in our view there were two verbal threats on which the jury might have relied to convict him.  The first occurred just as Williams entered the bedroom, when he told B.K., "You better get the fuck out of my house before I fucking kill you right now[,] you son of a bitch."  The second occurred while Williams was walking B.K. down the hallway and said, "[Y]ou're about to die, you dirty motherfucker."  Although the parties do not address the threats separately, in an abundance of caution we will evaluate whether either warranted a self-defense instruction.

It is well established that " ' "a trial court must instruct on general principles of law relevant to the issues raised by the evidence." ' " (*People v. Brooks* (2017) 3 Cal.5th 1, 73.)  This duty extends to instruction on defenses that are supported by substantial evidence and not inconsistent with the defendant's theory of the case.  (*Ibid*.; *People v. Townsel* (2016) 63 Cal.4th 25, 58.)  Conversely, an instruction on a defense need not be given when no substantial evidence supports it.  (*People v. Ponce* (1996) 44 Cal.App.4th 1380, 1386.)  " 'In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt" ' " about the defendant's guilt.  (*People v. Mentch* (2008) 45 Cal.4th 274, 288.)  We review claims of

11

instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579; *People v. Sisuphan* (2010) 181 Cal.App.4th 800, 806.)

Williams made the initial verbal threat *before* there was any evidence that he was in fear. He made it immediately upon entering the bedroom, at which point B.K. was unarmed and naked in bed with wife. Williams attempted to justify this threat by claiming that he did not know if wife had consented to the sexual intercourse. But even if Williams momentarily questioned whether wife was being assaulted, the circumstances as a whole rendered that belief unreasonable. He and wife were estranged, and he knew about her relationship with B.K. Indeed, Williams had previously expressed jealousy of B.K. and threatened to "beat [him] to the point of no recognition." Further, Williams admitted that any doubt about wife's consent lasted only "a very short moment." A fleeting and unsupported belief cannot justify a threat to kill.

Williams argues that some evidence indicated that he knew B.K. owned a gun. But even assuming this knowledge, he still lacked any objective basis to fear imminent harm when he entered the bedroom. B.K. was in a vulnerable position, and there was no indication that he had a gun nearby, much less on his person. Absent evidence of any threatening conduct by B.K., there was no basis for Williams to reasonably believe that he was in danger of imminent harm upon entering the bedroom.

The second verbal threat was likewise made under circumstances that did not support a reasonable belief that Williams was in imminent danger. When Williams threatened to kill B.K. the second time, B.K. was backing away with one palm raised. B.K. was still naked, holding his pants with the other hand, and he was several feet from any of his other belongings. He had already repeated several times, "I'm leaving," and asked Williams, "Can I get

12

my keys? My keys are on the table." Given B.K.'s supplicating posture and manner, there was no objective basis for Williams to perceive an imminent threat.

Williams also points to the men's prior "conflict" to justify his belief that he needed to defend himself throughout the encounter. However, their history consisted of Williams's own threats toward B.K., so any lingering fear would more logically have been B.K.'s, not Williams's. Williams testified that, before entering the house, he had no reason to fear or feel apprehensive about confronting B.K. Specifically, Williams conceded he had no "reason to think [B.K was] a threat."

In short, insufficient evidence supported a self-defense instruction as to the charge of criminal threats, and the trial court correctly refused to give it.

>  3.  The evidence supporting a self-defense instruction for the brandishing count did not support the same instruction for the criminal-threats count.

Williams also argues that because the trial court found sufficient evidence to justify a self-defense instruction on the brandishing charge, the same evidence necessarily supported the instruction on the criminal-threats charge. Again, we are not persuaded.

Williams's conduct, from the point he first pulled his gun to when he lowered it as B.K. was leaving, potentially supported a conviction of brandishing. Williams first pulled his gun in the bedroom, when he pointed it at B.K. while B.K. was on the floor. Williams had the gun out, although not always aimed at B.K., for the rest of the time until B.K. left the house.

Affording Williams every favorable inference, we conclude there was substantial evidence that Williams acted in self-defense by brandishing his weapon. Williams, daughter, and B.K. all testified that Williams exhibited his gun at some point while he was in the bedroom. Williams testified that

13

he was fearful that another gun was in play when B.K. dropped to the floor to retrieve his pants. Although Williams admitted that no other weapons were visible, he indicated that he nonetheless was afraid because he could not see what B.K. was grabbing. Given this testimony, there was substantial evidence that Williams exhibited his weapon only after perceiving a threat to his safety, supporting the court's decision to instruct on self-defense for brandishing.

In contrast, the circumstances that might have generated fear during the brandishing were absent when Williams issued either potential criminal threat. As we have explained, there was no substantial evidence that he had any objective basis to fear B.K. at those moments. Therefore, the court's decision to instruct on self-defense as to one count but not the other was not erroneous.

### B. *The Trial Court Did Not Abuse Its Discretion by Limiting the Expert Witness Testimony to the Brandishing Charge.*

Williams also claims that the trial court prejudicially abused its discretion by prohibiting the jury from considering the defense expert's testimony when evaluating the criminal-threats charge. Once again, we are not persuaded.

Before trial, the prosecution moved to exclude Coleman's use-of-force testimony on the ground that police tactics were irrelevant to a civilian confrontation. Williams's trial counsel responded that the testimony would demonstrate that "close-quarter defensive tactics" were ingrained in Williams as a result of his 23 years in law enforcement. Defense counsel argued that Coleman's testimony was admissible on the criminal-threats count to establish that Williams's statements were intended to compel B.K. to leave the residence, not to threaten him, which would negate the specific intent required for that charge. Counsel also argued that Coleman's testimony

14

supported a self-defense instruction for the brandishing charge, because it suggested that Williams's display of his gun was a defensive maneuver in response to the presence of B.K.'s firearm.

Following a hearing under Evidence Code section 402, the trial court partially granted and partially denied the prosecution's motion. The court ruled that Coleman's testimony was not probative on the criminal-threats count, because the threatening statements at issue did not reflect police training and "self-defense is not really a defense to a . . . section 422 crime [criminal threats]." By contrast, the court concluded that Coleman's testimony was relevant to the brandishing count, since his opinions on the appropriate use of force were potentially probative on whether Williams acted in self-defense.

During a later conference on jury instructions, the trial court reiterated that Coleman's testimony would be limited to the brandishing count, explaining that "it didn't seem like [the defense's expert] had anything to add other than [on] self-defense." As mentioned above, because the court had already determined that self-defense did not apply to criminal threats, it instructed the jury not to consider Coleman's testimony when evaluating that charge.

All relevant evidence is admissible unless specifically excluded by statute. (Evid. Code, § 351.) Evidence is relevant if it can logically help prove or disprove a disputed, consequential fact in the case, or if it bears on a witness's credibility. (*Id.*, § 210.) Expert opinion testimony is admissible only when the subject matter is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*Id.*, § 801, subd. (a).) The trial court has broad discretion in deciding to admit or exclude expert testimony, and the court's determination is reviewed for an abuse of

discretion.  (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)  An abuse of discretion exists only when the decision is "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

The only reason Williams gives for why the trial court should have permitted the jury to consider Coleman's testimony on the criminal-threats charge is that self-defense applied to that charge.  We necessarily reject this argument since we have already concluded that the court properly declined to instruct on self-defense as to criminal threats.  Nor do we perceive how the testimony was relevant on any other basis.  Notably, Coleman testified that police use-of-force training would not authorize the threatening language Williams used, meaning that such training did not otherwise help justify Williams's words.  Accordingly, the court did not err by limiting Coleman's testimony to the brandishing charge.

C.     *There Was No Cumulative Error.*

Finally, Williams contends that the cumulative effect of the two alleged errors requires reversal.  It is true that "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.)  Here, however, no error appears in either the failure to instruct on self-defense or the limiting of the expert testimony to the brandishing charge.  Thus, there is no prejudice to aggregate, and the claim fails.

III.
DISPOSITION

The judgment is affirmed.

16

_____

Humes, P.J.


WE CONCUR:


_____

Langhorne Wilson, J.


_____

Smiley, J.


*People v. Williams*  A170855


17